Slip Op. 19–156

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NANTONG UNIPHOS CHEMICALS CO., LTD., NANJING UNIVERSITY OF CHEMICAL TECHNOLOGY CHANGZHOU WUJIN WATER QUALITY STABILIZER FACTORY, and UNIPHOS, INC., | : : : : : : |
| Plaintiffs, | : : |
| v. | : |
| UNITED STATES, | : : |
| Defendant, | : : |
| and | : : |
| COMPASS CHEMICAL INTERNATIONAL LLC, | : : : |
| Defendant-Intervenor. | : : |

Before: Richard K. Eaton, Judge

Court No. 17-00151

## **OPINION**

[United States Department of Commerce's remand results are sustained.]

Dated: December 10, 2019

*David J. Craven*, Craven Trade Law LLC, of Chicago, IL, argued for Plaintiffs.

*Kelly A. Krystyniak*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *L. Misha Preheim*, Assistant Director. Of Counsel on the brief was *Christopher Hyner*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Jeffrey S. Levin*, Levin Trade Law, P.C., of Bethesda, MD, argued for Defendant-Intervenor.

Eaton, Judge: This case involves the United States Department of Commerce's ("Commerce" or the "Department") investigation, and final affirmative dumping determination, for imports of 1-Hydroxyethylidene-1, 1-Diphosphonic Acid ("HEDP")[1] from the People's Republic of China ("China"), and the results of Commerce's remand.[2] *See 1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Rep. of China*, 82 Fed. Reg. 14,876 (Dep't Commerce Mar. 23, 2017) ("Final Determination"), *amended by* 82 Fed. Reg. 22,807 (Dep't Commerce May 18, 2017) ("Amended Final Determination") and accompanying Issues and Dec. Mem. (Mar. 20, 2017), P.R.[3] 362 ("Final IDM"); Final Results of Redetermination Pursuant to Remand (Aug. 8, 2018), P.R.R. 11 ("Remand Results").

Plaintiffs are Nanjing University of Chemical Technology Changzhou Wujin Water Quality Stabilizer Factory ("Nanjing"), a producer and exporter of HEDP; its affiliate, Nantong Uniphos Chemicals Co., Ltd.[4]; and Uniphos, Inc., a U.S. importer (collectively, "Plaintiffs"). They contend that the dumping determination lacks the support of substantial evidence because the Department failed to use the "best available information," as required by the antidumping statute,

---

[1]     HEDP "is a chemical used in water treatment, detergents, cosmetics, and pharmaceuticals." *1-Hydroxyethylidene-1, 1-Diphosphonic Acid* (*HEDP) from China*, USITC Publication 4686, Inv. Nos. 701-TA-558 and 731-TA-1316 (Final) (May 2017) at 6; *1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Rep. of China*, 81 Fed. Reg. 76,916, app. I (Dep't Commerce Nov. 4, 2016) (defining scope of investigation).

[2]     On May 10, 2018, the court granted the parties' request to remand the matter to Commerce. *See* Order dated May 10, 2018, ECF No. 35.

[3]     Record citations herein are to the public record ("P.R.") and the public remand record ("P.R.R.").

[4]     Commerce collapsed Nanjing and Nantong Uniphos Chemicals Co., Ltd. into a single entity because of overlaps in the companies' operations and ownership. *See* Prelim. Dec. Mem. (Oct. 27, 2016), P.R. 314 at 14; 19 C.F.R. § 351.401(f)(1) (2016). In this opinion, references to Nanjing mean the collapsed entity.

to calculate (1) surrogate financial ratios, and (2) a surrogate value for ocean freight. *See* Pls.' Cmts. Remand Results, ECF Nos. 50 ("Pls.' Cmts.").

The United States ("Defendant"), on behalf of Commerce, and Defendant-Intervenor Compass Chemical International LLC ("Compass"), the petitioner and a U.S. producer of HEDP, urge the court to sustain the Remand Results. *See* Def.'s Resp. Pls.' Cmts. Remand Results, ECF No. 54 ("Def.'s Resp."); *see also* Def.-Int.'s Resp. Pls.' Cmts. Remand Results, ECF No. 55.

Jurisdiction is found under 28 U.S.C. § 1581(c) (2012) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2012). For the reasons stated below, the court sustains the Remand Results.

## BACKGROUND

On March 31, 2016, Compass filed an antidumping petition, asking Commerce to investigate imports of HEDP from China that allegedly were being sold, or were likely to be sold, at less than fair value. *See* Letter from Levin Trade Law, P.C. to Penny Pritzker, Sec'y of Commerce (Mar. 31, 2016), P.R. 1. On April 28, 2016, the Department commenced an investigation covering the period of July 1, 2015, through December 31, 2015, and selected two mandatory respondents to be investigated, one of which was Nanjing.[5] *See 1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Rep. of China*, 81 Fed. Reg. 76,916 (Dep't Commerce Nov. 4, 2016) ("Preliminary Determination") and accompanying Prelim. Dec. Mem. (Oct. 27, 2016), P.R. 314 ("Prelim. Dec. Mem.") at 4.

---

[5]     The other mandatory respondent, Shandong Taihe Chemicals Co., Ltd., is not a party to this action.

## I.        Preliminary Determination

On November 4, 2016, the Department published its preliminary affirmative dumping determination. *See* Preliminary Determination, 81 Fed. Reg. at 76,916. In making its determination, Commerce selected Mexico as the primary surrogate country.[6] *See* Prelim. Dec. Mem. at 10.

To determine the normal value of the subject chemicals, Commerce valued Nanjing's factors of production[7] using Mexican surrogate data, to which it added an amount for "general expenses and profit." 19 U.S.C. § 1677b(c)(1)(B). To arrive at an amount for "general expenses and profit," Commerce calculated surrogate financial ratios (for factory overhead; selling, general, and administrative expenses; and profit) using the 2015 financial statements of two Mexican chemical companies: Grupo Pochteca, S.A.B. de C.V. ("Pochteca") and CYDSA S.A.B. de C.V. ("CYDSA").[8] *See* Surrogate Values for the Prelim. Determination (Oct. 27, 2016), P.R. 320 at 5.

---

[6]        In a nonmarket economy case, Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit," using the "best available information" from a surrogate market economy country (or countries). 19 U.S.C. § 1677b(c)(1)(B). The surrogate country must be "at a level of economic development comparable to that of the nonmarket economy country, and . . . [a] significant producer[] of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

[7]        "[T]he factors of production utilized in producing merchandise include, but are not limited to . . . (A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3).

[8]        The Pochteca and CYDSA financial statements were placed on the record by Petitioner and Defendant-Intervenor Compass. Nanjing did not place any surrogate financial statements from Mexico on the record. Early in the proceeding, the company argued in favor of selecting South Africa as the surrogate country and submitted financial statements from two South African companies. *See* Prelim. Dec. Mem. at 9. Although, ultimately, South Africa was not chosen, no party disputes Commerce's choice of Mexico as the surrogate country.

This amount, based on the ratios, was then added to the values of the factors of production, resulting in the normal value of the imported merchandise. *See* 19 U.S.C. § 1677b(c)(1).

To determine U.S. price, Commerce made deductions for movement expenses, including ocean freight. *See* Prelim. Dec. Mem. at 19; Prelim. Results Analysis Mem. for [Nanjing] (Oct. 27, 2016), P.R. 323 at 2. Commerce determined a surrogate value for the ocean freight deduction based on four shipping price quotes obtained from a publicly available database known as the Descartes Carrier Rate Retrieval Database.[9] *See* Prelim. Dec. Mem. at 24; Letter from Levin Trade Law, P.C. to Penny Pritzker, Sec'y of Commerce (Aug. 18, 2016), P.R. 147 Ex. 11 ("Descartes Data"). The Descartes database contained "international ocean freight rates offered by numerous carriers" for the period of investigation. *See* Prelim. Dec. Mem. at 24. Of the four Descartes price quotes, two listed several fees that were included in the quote, and two were less detailed, including only a "port surcharge fee." *See* Descartes Data.

## II.       Final Determination

On May 18, 2017, Commerce published the Final Determination, in which it continued to find that imports of HEDP from China were being sold, or were likely to be sold, in the United

---

[9]        For ocean freight, Commerce stated:

We valued [ocean] freight from [nonmarket economy] carriers using the data obtained from Descartes. The Descartes data provides pricing information from different ports in [China] to different ports in the United States for different container sizes. We included any charges that were not accounted for elsewhere in the margin calculation. To calculate a USD per kg rate, we divided the container rate by the average weight of fully loaded refrigerated container, as reported by Maersk. Because these rates were contemporaneous, we did not inflate them.

Surrogate Values for the Prelim. Determination at 6. Commerce later "clarifie[d] that the price quote for [the] ocean freight [surrogate value] from Descartes is not for refrigerated freight," but for non-refrigerated containers. Final IDM at 20.

States at less than fair value during the period of investigation. *See* Final Determination, 82 Fed. Reg. at 14,876.

For normal value, Commerce again used both Pochteca's and CYDSA's financial statements as the "best available information" to calculate surrogate financial ratios. *See* Surrogate Values for the Final Determination (Mar. 20, 2016), P.R. 374 at 3 & 375 (exhibits). To determine a surrogate value for ocean freight, Commerce also continued to use the four quotes from the Descartes database. *See* Final IDM at 20. Ultimately, Commerce calculated an antidumping duty rate of 63.80 percent for Nanjing. *See* Am. Final Determination, 82 Fed. Reg. at 22,808.

On June 16, 2017, Plaintiffs commenced this action to dispute the Final Determination. *See* Summons, ECF No. 1. Subsequently, Defendant filed, with Plaintiffs' consent, a remand request, seeking an opportunity to reconsider the surrogate value determinations disputed by Plaintiffs. Specifically disputed were (1) the Department's use of CYDSA's financial statement to calculate surrogate financial ratios, and (2) the alleged double-counting of fees and charges that were included not only in the ocean freight surrogate value, but also in the surrogate value for brokerage and handling.[10] On May 10, 2018, the court granted the motion and remanded the Final Determination to Commerce. *See* Order dated May 10, 2018, ECF No. 35.

### III.    Remand Results

#### A.    Surrogate Financial Ratios

The Department calculates surrogate financial ratios: (1) for factory overhead, Commerce divides a surrogate company's total factory overhead expenses by its total direct manufacturing

---

[10]    Commerce valued brokerage and handling expenses using a World Bank publication, Doing Business 2016: Mexico. *See* Surrogate Values for the Prelim. Determination at 6; Surrogate Values for the Final Determination Ex. 1, P.R. 375.

expenses; (2) for selling, general, and administrative expenses, Commerce divides the surrogate's

selling, general, and administrative costs by its total cost of manufacture; and (3) for profit,

Commerce divides the surrogate's before-tax profit by the sum of direct manufacturing expenses,

overhead, and selling, general, and administrative expenses. *See Shanghai Foreign Trade Enter.*

*Co. v. United States*, 28 CIT 480, 482, 318 F. Supp. 2d 1339, 1341 (2004). In the Remand Results,

Commerce continued to use both Pochteca's and CYDSA's financial statements to calculate these

ratios. *See* Remand Results at 3. The ratios for each company were converted into percentages,

averaged, and then multiplied by the surrogate values for direct expenses, overhead, and selling,

general, and administrative expenses. *See Shanghai Foreign Trade Enter. Co.*, 28 CIT at 482, 318

F. Supp. 2d at 1341. The resulting amounts were then added to surrogate values for the factors of

production to determine normal value. *See* 19 U.S.C. § 1677b(c)(1), (4).

## B.     Ocean Freight

In the Remand Results, Commerce found that it was possible that it had double counted

some fees that appeared not only in the Descartes database, but also in the World Bank Doing

Business Report that Commerce used to value brokerage and handling:

> [Ocean] freight was valued using four price quotes [from the Descartes
> database] . . . . Two of the four price quotes contain a list of small fees associated
> with the shipment, fees which were included in the [surrogate value] calculation
> (*i.e.*, Suez Canal transit fee, Panama Canal transit fee, carrier security charge, high
> security seal charge, Gulf of Aden charge, equipment interchange receipt fee,
> OTHC – non-reefer,[11] bunker charge, documentation fee, advance manifest
> security charge, Customs importer security filing). [Plaintiffs have] argued that
> certain of these fees should be excluded from the calculation, because they claim
> these are already included in the brokerage and handling surrogate value. We note
> that these fees are not defined on the record. In addition, whereas these fees are
> very specific, the *Doing Business* charges are for general categories of fees. It is
> Commerce's practice to avoid double counting. As such, we have excluded two of

---

11      "OTHC – non-reefer" means Export Terminal Handling Charges for non-
refrigerated cargo. *See* Final IDM at 20; Pls.' Cmts. 4.

> the four international freight price quotes from the calculation of the international
> freight [surrogate value] in order to avoid any possibility of double counting.

Remand Results at 24. Commerce's revisions to its calculation resulted in a revision of the ocean

freight value from 0.1833 USD/kg to 0.1962 USD/kg, and, thus, an increase in the amount

deducted from U.S. price (*i.e.*, a lowering of U.S. price). *See* Surrogate Values for the Final

Determination Ex. 1; Final Redetermination Analysis Mem. for [Nanjing] (Aug. 8, 2018), P.R.R.

12 ("Remand Analysis Mem.") at 2. Consequently, Nanjing's antidumping rate increased from

63.80 percent to 67.66 percent. *See* Remand Analysis Mem. at 1 (indicating cash deposit rate of

67.66 percent for Nanjing).

Dissatisfied with the Remand Results, Plaintiffs ask the court to again remand to

Commerce with instructions "to recalculate the margins using only the financial statement of

[Pochteca] as the basis for financial ratios." Pls.' Cmts. 26. Additionally, arguing that Commerce

used the wrong two price quotes to make its ocean freight calculation, Plaintiffs ask the court to

direct Commerce "to recalculate the [o]cean [f]reight [e]xpense . . . to avoid double counting."

Pls.' Cmts. 26.


## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).


## LEGAL FRAMEWORK

Under the antidumping statute, Commerce is charged with determining if goods are being

sold, or are likely to be sold, in the United States at less than fair value. *See* 19 U.S.C. § 1673. This

determination is based on a comparison of normal value (home market price) and export price (U.S. price). *See* 19 U.S.C. § 1677b(a). The Department calculates a dumping margin for the subject merchandise by finding the amount by which normal value exceeds export price. 19 U.S.C. § 1677(35)(A). Commerce then uses this margin to determine an antidumping duty rate.

When merchandise is exported from a nonmarket economy country,[12] such as China, the statute directs Commerce to calculate normal value using surrogate values rather than the values reported by the respondent. As this Court has explained:

> Commerce calculates the normal value by determining and aggregating "surrogate values" for various "factors of production" used in producing the subject merchandise, *to which it also adds an amount for general expenses and profit* as well as amounts for the cost of containers, coverings, and other expenses. . . . The statute requires Commerce to base its valuation of the factors of production on the "best available information regarding the values of such factors in a market economy country or countries considered appropriate by the administering authority [*i.e.*, Commerce]."

*Shanghai Foreign Trade Enter. Co.*, 28 CIT at 482, 318 F. Supp. 2d at 1341 (emphasis added) (internal citations omitted). To determine an amount for "general expenses and profit," Commerce calculates three separate values for (1) factory overhead, (2) selling, general and administrative expenses, and (3) profit, using ratios derived from surrogate financial statements:

> For the [factory] overhead ratio, Commerce typically divides total [factory] overhead expenses by total direct manufacturing expenses. . . . To calculate the [selling, general, and administrative expense] ratio, the Commerce practice is to divide a surrogate company's [selling, general, and administrative] costs by its total cost of manufacturing. . . . Finally, to determine a surrogate ratio for profit, Commerce divides before-tax profit by the sum of direct expenses, [factory] overhead and [selling, general, and administrative] expenses. . . . These ratios are converted to percentages ("rates") and multiplied by the surrogate values assigned by Commerce for the direct expenses, [factory] overhead and [selling, general, and administrative] expenses.

---

[12]     A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

*Id.* When calculating surrogate financial ratios, "[g]enerally, if more than one producer's financial statements are available, Commerce averages the financial ratios derived from all the available financial statements." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319-20 (Fed. Cir. 2010) (citation omitted).

The "best available information" rule applies to the selection of financial statements. *See Dongguan Sunrise Furniture Co. v. United States*, 36 CIT 860, 882-83, 865 F. Supp. 2d 1216, 1240 (2012) (citing 19 U.S.C. § 1677b(c)(1)(B)). The statute does not define "best available information." The Federal Circuit, however, has endorsed the view that "while 'a surrogate value must be as representative of the situation in the [nonmarket economy] country as is feasible,'" the statute does not require that Commerce "'duplicate the exact production experience of the [Chinese] manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of [the subject merchandise] in a [hypothetical] market-economy [China].'" *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (quoting *Nation Ford Chem. Co. v. United States*, 21 CIT 1371, 1375-76, 985 F. Supp. 133, 137 (1997)) ("The 'best available information' concerning the valuation of a particular factor of production may constitute information from the surrogate country that is directly analogous to the production experience of the [nonmarket economy] producer . . . or it may not.").

Generally, when choosing the "best available" surrogate market economy data on the record, Commerce selects, to the extent practicable, surrogate data that is "publicly available, . . . product-specific, reflect[s] a broad market average, and [is] contemporaneous with the period of [investigation]." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014); *see also* 19 C.F.R. § 351.408(c)(4) (2016) ("For manufacturing overhead, general expenses,

and profit, the Secretary normally will use non-proprietary information gathered from producers

of identical or comparable merchandise in the surrogate country."). "Commerce's choice of the

best available information 'must evidence a rational and reasonable relationship to the factor of

production it represents' to be supported by substantial evidence." *Calgon Carbon Corp. v. United

States*, 40 CIT __, __, 145 F. Supp. 3d 1312, 1323 (2016) (citation omitted) (noting statutory

objective to "obtain[] the most accurate dumping margins possible"). The process of constructing

normal value in nonmarket economy cases "is difficult and necessarily imprecise." *Shakeproof

Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed.

Cir. 2001) (citation omitted). "[T]he critical question is whether the method[] used by Commerce

is based on the best available information and establishes antidumping margins as accurately as

possible." *Id.* at 1382.


## DISCUSSION

**I.     Because Commerce Used the Cost of Goods Sold Entry from CYDSA's Financial
         Statement to Determine the Denominators of the Surrogate Financial Ratios, the
         Complained-of Flaws, Even if Valid, Are of Little Importance**

In order to calculate the amount for materials, labor, and energy ("MLE")—which was

derived from the total cost of manufacture[13] and which was used to calculate the denominators in

the financial ratios—Commerce used the cost of goods sold entry from CYDSA's financial

statement.[14] *See* Remand Results at 4 ("[T]he cost of goods sold include[s] all the manufacturing

---

[13]     The cost of manufacture is "the sum of material, fabrication and other processing
costs incurred to produce the products under investigation . . . ." 1 JOSEPH E.
PATTISON, ANTIDUMPING & COUNTERVAILING DUTY LAWS 1312 (2017 ed.).

[14]     The lawfulness of the method Commerce used to arrive at the materials, labor, and
energy amount is not in dispute.

costs and changes in the finished goods inventory."). The cost of goods sold "equals beginning

inventory plus cost of goods purchased or manufactured minus ending inventory." SIDNEY

DAVIDSON, CLYDE P. STICKNEY & ROMAN L. WEIL, FINANCIAL ACCOUNTING 805 (4th ed. 1985).

Plaintiffs contend that substantial evidence does not support Commerce's reliance on

CYDSA's financial statement to calculate the surrogate financial ratios because it is "fatally

flawed." *See* Pls.' Cmts. 8. For Plaintiffs, this fatal flaw is that the financial statement does not

clearly delineate labor, energy, and selling and administrative expenses, and therefore "provides

no reasonable way to allocate values" for these expenses. Pls.' Cmts. 8.

Commerce maintains that CYDSA's financial statement was the best available source of

information to find an amount for the surrogate producer's total cost of manufacture, and then

MLE, because it contained an entry for the cost of goods sold. The Department stated that it prefers

using the entry for the cost of goods sold because it pertains solely to manufacturing, while an

entry for, say, labor could pertain to the company's other functions, such as administration:

> Commerce prefers to use financial statements that list costs by function rather than
> by type of transaction, because expenses such as labor can relate to manufacturing,
> administration, and selling. In this investigation, CYDSA's income statement lists
> costs by functions (*e.g.*, cost of goods sold, selling, administration, *etc.*).
> Commerce's preference is to use financial statements that include a line item for
> the cost of goods sold, because *we know that the cost of goods sold include[s] all
> the manufacturing costs and changes in the finished goods inventory. From the cost
> of goods sold amount, we can calculate the cost of manufacturing by accounting
> for the change in the finished goods inventory from the inventory amounts reported
> in the corresponding comparative balance sheets. From the cost of manufacturing,
> we deduct the depreciation costs reflected in the notes to the financial statements,
> with the residual classified as materials, labor and energy (MLE).* In this
> investigation, we made inventory adjustments consistent with our practice but
> because [CYDSA] reported no depreciation with respect to cost of goods sold, we
> made no adjustment for depreciation.

Remand Results at 4 (emphasis added). Thus, Commerce found that, from the cost of goods sold,

it could determine the cost of manufacture, which, with adjustments, equaled MLE. That is,

Commerce, using the normal rules of cost accounting, expressed its preference for deriving the

cost of manufacture from the cost of goods sold entry on financial statements, rather than by adding

various individual entries for items such as wages and salaries that may, or may not, relate to the

manufacture of a product. By definition, the cost of goods sold entry captures all of the costs of

manufacture. *See* DAVIDSON, STICKNEY & WEIL at 805 (defining cost of goods sold).

### A.     Claimed Flaws Related to Labor

While Commerce used the cost of goods sold entry from CYDSA's financial statement as

the starting point for determining MLE, and thus the denominators in the financial ratios, it did

make some adjustments, taking into consideration other line items in the financials, *e.g.*, the

"wages and salaries" and executive pay entries. *See* Surrogate Values for the Final Determination

Ex. 1.

Plaintiffs argue that Commerce's use of the wages and salaries entry from CYDSA's

financial statement led to the unreasonable undervaluation of labor costs. Plaintiffs maintain that

the wages and salaries entry (6,000,000 pesos) was the only line item that clearly pertained to labor

and that the amount for the entry was insufficient to account for the cost of labor used to make

CYDSA's chemicals.[15] Plaintiffs argue:

> With respect to the value of 6,000,000 pesos, the line item expressly for labor does
> *not* delineate the cost of labor associated with the cost of goods sold; it is in the
> balance account as a liability and not in the cost account. This line item thus
> represents the amount owed or payable from an unknown period. This also explains
> why the labor amount is so small and immaterial and unrealistic—driving up the
> overhead and [selling, general, and administrative] ratios. If this line item actually
> accounted for the cost of labor, then labor would only account for *0.18%* of the
> costs of goods sold (6,000,000/3,378,000,000=[.]0018). This is not commercially

---

[15]     In 2015, six million pesos was the equivalent of approximately $378,072, according
to the exchange rate cited in CYDSA's financial statement. *See* Letter from Levin Trade Law, P.C.
to Penny Pritzker, Sec'y of Commerce (Aug. 18, 2016), Ex. 17 (citing average exchange rate of
15.87 pesos per U.S. dollar in 2015).

> feasible nor is it reasonable for a company which, as illustrated by the photographs
> in the financial statement, does not have a fully automated production technology.

Pls.' Cmts. 9. Plaintiffs further contend that the "absurdity" of the six-million-peso figure is even

more apparent when CYDSA's reported payments to the company's defined contribution plan are

taken into consideration. *See* Pls.' Cmts. 10. According to Plaintiffs, the CYDSA financials shows

that the company made payments into the defined contribution plan of at least 500 million pesos.

*See* Pls.' Cmts. 10 (citing Letter from Levin Trade Law, P.C. to Penny Pritzker, Sec'y of

Commerce (Aug. 18, 2016), Ex. 17 ("CYDSA's Financial Statement") at Note 16(f) ("The

Company makes payments between 2% and 3% of its workers integrated wage limited to the

defined contribution plan related to the established by the law system of retirement savings.

Expenses for this item [were] [17,000,000 pesos] in 2015 and [14,000,000 pesos] in 2014.").

Plaintiffs explain their calculations as follows: using 3%, 17,000,000 pesos times one divided by

0.03 equals 566,666,666 pesos (17,000,000 * 1/0.03 = 566,666,666); using 2%, 17,000,000 pesos

times one divided by 0.02 equals 850,000,000 pesos (17,000,000 * 1/0.02 = 850,000,000). Thus,

for Plaintiffs, Commerce's use of CYDSA's financial statement is not supported by substantial

evidence, and CYDSA's financials do not constitute the "best available information" because the

line item for wages and salaries is manifestly inadequate, *i.e.*, CYDSA must have spent much more

on labor to make its products.

In the Remand Results, Commerce "agree[d] with [Plaintiffs] that 6 million pesos [was]

not the full amount of labor cost incurred by CYDSA. However, in addition to the 6 million pesos

reported as wages and salaries, Commerce included an additional 178 million pesos in the

calculation of MLE, reported as wages for managers." Remand Results at 5. In addition to these

amounts for wages, which totaled 184,000,000 pesos, Commerce found that a significant portion

of the cost of goods sold entry amount was labor cost:

> [A]fter taking CYDSA's reported cost of goods sold, and making . . . adjustments
> . . . (*i.e.*, changes in inventory and depreciation) an additional 2 billion pesos is
> included in [materials, labor, and energy] which accounts for labor and other costs.
> In fact, CYDSA reports raw materials separately from the cost of goods sold, and
> indicates that it accounted for electricity as a raw material. *Because CYDSA lists*
> *raw materials and electricity separately from the cost of goods sold, we believe a*
> *significant portion of the 2 billion pesos figure of the cost of goods sold is labor*
> *cost*. Although labor is not specifically listed as an individual line item in the costs
> of goods sold, we disagree with [Plaintiffs] that labor is undervalued in our
> calculation of MLE.

Remand Results at 5 (emphasis added). In other words, from the information in CYDSA's

financial statement on cost of goods sold (3,378,000,000 pesos) and raw materials, including

electricity (1,060,000,000 pesos), Commerce drew the conclusion that a large portion of the two-

billion-peso difference between those two figures represented labor. *See* CYDSA's Financial

Statement at 1. Commerce's point is that if the two billion pesos was not labor, what else could it

be, since the cost of goods sold entry necessarily captures all of the costs of manufacture.

Commerce nonetheless undertook to show how labor was accounted for and was

reasonable in its conclusion that the presence of the small entry for wages and salaries does not

render the CYDSA financials anything other than the best available information, or the calculation

of the financial ratios unsupported by substantial evidence. In fact, Plaintiffs' argument is a little

hard to follow. As has been discussed, Commerce did not find MLE by determining the sum of

various individual entries on the financials. Rather, it started with the cost of goods sold entry,

which accounted for the cost of labor along with the other costs of manufacture. While it made

some adjustments to the cost of goods sold amount, the Department knew that it already had the

vast majority of the costs of manufacture, because the cost of goods sold entry accounts for those

costs.

Commerce's rationale for concluding that labor is adequately represented in the cost of

goods sold entry is both reasonably discernable and reasonable itself. While agreeing that the

wages and salaries entry was too low to account for the full cost of labor in the manufacture of

CYDSA's products, Commerce reasonably found that the full cost of labor could (indeed must)

have been accounted for elsewhere. By definition, the cost of goods sold entry represents one

hundred percent of the cost of manufacture. That is, one hundred percent of the cost of material,

labor, and energy. While Commerce found that CYDSA accounted for at least some raw materials

and electricity separately, it was apparent that the wages and salaries entry could not represent the

full cost of labor used in manufacturing CYDSA's chemicals. This is where the two-billion-peso

figure comes in. Since all of the costs of manufacture are captured in the entry for the cost of goods

sold and the two billion pesos of unaccounted-for costs represented about two-thirds of the cost of

goods sold, a large portion of it had to be labor. Based on the Department's explanation, the court

finds that Commerce has reasonably supported its finding that labor was adequately represented

in the MLE amount, and that the wages and salaries entry does not constitute a fatal flaw in the

financials. *See Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir.

1987) (per curiam).

> **B.      Claimed Flaws Related to Energy and Expenses for the Production of
>            Electricity**

Next, Plaintiffs argue that CYDSA's financial statement is not the best available

information because necessary information is missing as to the cost of energy, and the amount of

selling and administrative expenses associated with CYDSA's self-production of electricity:

> The CYDSA statement . . . does not have an energy line item; rather it appears that
> the Department has characterized that portion of the cost of goods produced which
> could not be tied to labor or raw material . . . as "energy." . . .  Moreover, given the
> numerous costs of goods sold line items lacking from the CYDSA statement, such
> as actual labor costs[,] . . . this line [*i.e.*, the line item for cost of goods sold
> (3,378,000,000 pesos)] may not *only* include the costs of energy.

Pls.' Cmts. 11 (citing Remand Results at 6) (emphasis added). In other words, as with the wages and salaries entry, Plaintiffs insist that individual entries could not represent the costs Plaintiffs believe they should represent, so they claim that the financials are flawed. They make this argument even though these individual entries were not used to find MLE. Rather, the cost of goods sold entry was used to derive MLE.[16]

As with labor, it is worth reiterating that MLE is derived from the cost of goods sold entry and that the cost of goods sold is not the sum of individual financial statement entries. Rather, at bottom, the cost of goods sold is found by subtracting the cost of ending inventory from beginning inventory, plus additions. As has been noted, by definition, the cost of goods sold captures all of the costs of manufacture. Thus, even if CYDSA's financials had an entry for energy, it would not enter into the calculation of MLE.

Nonetheless, for Plaintiffs, "at least a portion of the raw materials produced by CYDSA [*e.g.*, electricity] is directly tied to values which are reported in the selling and administrative expenses. . . . Absent a more detailed breakdown, however, it is impossible to determine the complete nature of such expenses." Pls.' Cmts. 12.

As part of its argument, Plaintiffs maintain that CYDSA self-produced "much" of the electricity it consumed during the period of investigation, but that its financial statement does not permit a complete understanding of the costs associated with starting up the company's first electricity co-generation plant:

> [A]s much of [CYDSA's] energy is self-produced, . . . the energy value would need to include a portion of depreciation for those [electricity co-generation] assets, the administrative charges to operate the facility and similar cost[s] for the self-production of the energy.

---

[16]     As noted, MLE (an amount for materials, labor, and energy) is derived from the cost of manufacture and is included in the denominators of the financial ratios. *See* Remand Results at 5.

Pls.' Cmts. 11. Thus, for Plaintiffs, the cost of energy should be adjusted to reflect the costs to

build and to run the co-generation plant.

In the Remand Results, Commerce found that energy was properly captured in the MLE

amount, and not elsewhere, *i.e.*, in factory overhead, or selling, general, and administrative

expenses:

> [Plaintiffs] speculate[] that CYDSA's energy production may be reported under
> overhead or [selling, general, and administrative expenses]; however, [they]
> provided no evidence showing that energy expenses are included in these
> categories. For our calculation of the overhead ratio, we have included only
> depreciation, with an adjustment for spare parts inventory. Our calculation of
> [selling, general, and administrative expenses] includes only amortization, selling
> expenses, administrative expenses and finance expenses, adjusted by certain types
> of income. As such, energy is not listed in any of the categories comprising
> overhead and [selling, general, and administrative expenses]. Moreover, just as
> [Plaintiffs] indicate[] that electricity may be considered a raw material, *CYDSA
> indicates that it reported electricity as a raw material*. We specifically included
> CYDSA's reported raw materials in our calculation of MLE. Thus, we find that
> electricity is included in MLE, and not in overhead or [selling, general, and
> administrative expenses].

Remand Results at 6 (emphasis added).

Commerce's decision to make an adjustment to the cost of goods sold by including the

entry for raw materials when determining MLE was reasonable. It was also reasonable for the

Department to find that, at least some of CYDSA's energy cost was covered by the raw materials

entry. It cannot be disputed that CYDSA reported electricity as a raw material. *See* CYDSA's

Financial Statement ("Gas and electricity are raw materials used in the production of chlorine and

caustic soda . . . ."). Commerce made an adjustment to the cost of goods sold entry to reflect the

inclusion of energy in the raw materials entry. And, while it is true, as Commerce acknowledged,

that CYDSA self-produced electricity, it is also true that, as Plaintiffs argue, the information in the

statement about the selling and administrative expenses associated with that self-production is not

sufficiently itemized to be useful. It would have been unreasonable for Commerce to disregard the CYDSA financial statement based on speculation concerning the amount of energy it self-produced or the amount it purchased. This is particularly the case since the cost of goods sold covers the cost of manufacturing CYDSA's products. Thus, the court finds that Commerce has supported with substantial evidence and with a reasonable explanation its treatment of the cost of energy and CYDSA's self-production of electricity in its calculation of MLE.

### C. Commerce's Use of CYDSA's Cost of Goods Sold Amount to Determine the Denominators of Surrogate Financial Ratios Is Sustained

The CYDSA financial statement satisfies Commerce's preference for financials that are publicly available, product-specific, and contemporaneous with the period of investigation. *See Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386. Plaintiffs, however, say that entries either found in the financial statement or missing from it, render it fatally flawed. In making their argument, however, Plaintiffs do not question using the cost of goods sold as the basis for deriving MLE, or seriously dispute the adjustments made to the cost of goods sold to arrive at MLE, and, thus, the denominators used in calculating the financial ratios. Rather, Plaintiffs claim that the CYDSA financials are unusable because of (1) entries that are separate from the cost of goods sold entry, or (2) the lack of entries that, were they in the financials, would also be separate from the cost of goods sold entry. The overarching problem with Plaintiffs' claims is that, by definition, the cost of goods sold entry contains all of the costs of manufacture, including materials, labor, and energy. While Commerce's examination of CYDSA's financials caused it to make certain adjustments to the cost of goods sold number using individual entries, the resulting MLE number (3,203,000,000 pesos) is 94 percent of the cost of goods sold amount (3,378,000,000 pesos). Plaintiffs' arguments, even if credited, simply are not sufficient to find CYDSA's financial statement fatally flawed.

Indeed, it appears that Plaintiffs' disagreement is with the fundamentals of cost accounting rather

than Commerce's decision to use the CYDSA financials.

## II.      Claimed Differences Between Plaintiffs' and CYDSA's Marketing and Branding Activities and Levels of Integration Did Not Render Unreasonable Commerce's Use of CYDSA's Financial Statement

Plaintiffs also challenge Commerce's decision to rely on CYDSA's financial statement on

the grounds that Plaintiffs' marketing and branding expenses, and levels of integration, were

sufficiently different from CYDSA's so as to distort the calculation of the financial ratios. *See* Pls.'

Cmts. 18, 22 ("[Because] the operations of CYDSA and plaintiffs are radically dissimilar it is

inappropriate to use CYDSA as the basis for financial ratios, particularly where, as here, another

financial statement [*i.e.*, Pochteca's] which has not been challenged by any party, is of record.").

### A.      Claimed Differences in Marketing and Branding Activities

For Plaintiffs, the "record is clear" that "CYDSA and plaintiffs have significantly different

marketing and branding expenses." Pls.' Cmts. 18. In the Remand Results, however, Commerce

took a contrary view of the record:

> With respect to marketing, we do not find sufficient record information exists that would result in a finding that this expense distorts the surrogate ratios. We did not examine [Nanjing's] marketing and branding activities during the course of the investigation. Because [Nanjing] is located in [a nonmarket economy], and Commerce does not rely on prices in [nonmarket economy] countries,[17] any marketing in which [Nanjing] engages in its home market would be irrelevant for our dumping analysis, and we do not request this information from [nonmarket economy] respondents in the standard questionnaire. As such, the record contains no information with respect to [Nanjing's] marketing and branding, making a comparison to CYDSA futile. Although [Nanjing] states it engages in no marketing, has no brands and that its customers receive profits from the [selling, general, and administrative expenses] they invest, there is no record information to support these assertions.

---

[17]      As has been noted, in a nonmarket economy country, Commerce relies on surrogate values to determine normal value. *See* 19 U.S.C. § 1677b(c).

> Moreover, the record evidence conflicts with [Nanjing's] claim that CYDSA's marketing expenses are large. While the CYDSA statements discuss its [edible and industrial] salt business, its marketing and branding expenses are not broken out, and thus, we do not know what portion of CYDSA's selling expenses can be attributed to marketing and branding. As such, it is not clear that CYDSA's marketing and branding are necessarily the major contributors to its selling expenses. While [Nanjing] speculates that it and CYDSA have vastly different marketing and branding expenses, we find the record does not support such a finding.

Remand Results at 19-20. In other words, because Commerce sought no information on marketing and Nanjing itself placed no information on the record, there is simply no record evidence from which to determine if Nanjing had any marketing expenses or not. This being the case, there is no way to tell if Nanjing's and CYDSA's marketing expenses were similar or not. In addition, according to Commerce there is not enough record evidence with respect to CYDSA to make a reasoned assessment of the value of its marketing expenses in any event.

Notwithstanding that Commerce's questionnaire did not ask specifically for information on Nanjing's marketing and branding activities in China, and having placed on the record no relevant evidence themselves, Plaintiffs submit that there is information on the record that shows that Nanjing marketed and branded its products on a more limited scale than CYDSA. *See* Pls.' Cmts. 15 ("[W]hether or not the Department sought to expressly collect detailed information, it did collect information showing the very limited nature of the plaintiffs' marketing operations."). To make their case, Plaintiffs quote Nanjing's initial Section A questionnaire response, which asked for information regarding the company's independence from state control, in which it stated:

> [Nanjing] is independent in the price negotiations for the exports of the subject merchandise to the United States. . . . [Nanjing] conducted its price negotiations by phone . . . [but] the company does not keep phone logs of meetings conducted over the phone . . . . [Thus, it] . . . has no records of price negotiations.

Pls.' Cmts. 15-16. In addition, Plaintiffs quote a passage from their response stating that Nanjing "identified . . . potential customers through . . . [participation in an] exhibition show," through its

web site, and through personal contacts. Pls.' Cmts. 16. Plaintiffs also cite the 2014 and 2015

advertising expenses from the profit and loss statement of Plaintiff Uniphos, Nanjing's "U.S. sales

arm," which, they submit, do not reflect "the marketing efforts of a sophisticated company." Pls.'

Cmts. 16. Plaintiffs claim that, by comparison, CYDSA's financial statement shows that the

company's salt business sells many brands of edible and industrial salt that are "sold in the

consumer market with significant efforts spent on improving the brand image including in store

product demonstrat[ions]." Pls.' Cmts. 17.

The court is not persuaded that the claimed dissimilarities between CYDSA's and

Plaintiffs' marketing and branding expenses distorted surrogate financial ratios. First, it is difficult

to see the usefulness of Nanjing's Section A response to Plaintiffs' argument regarding the scale

of its marketing activities. The response states that Nanjing conducted customer negotiations by

telephone. That the company negotiates prices over the phone says nothing, however, about the

size of its advertising budget, or its efforts to seek new customers or continue the interest of

existing customers. Likewise, it is difficult to draw any conclusion about the size of Nanjing's

marketing budget from statements about attending an "exhibition show" and maintaining a web

site to "identif[y] potential customers." Pls.' Cmts. 16. Regarding Plaintiff Uniphos' profit and

loss statement, although Plaintiffs characterize the company as Nanjing's "U.S. sales arm," they

cite no evidence to support the conclusion that Uniphos' marketing expenses, as reflected on its

own profit and loss statement, may be properly imputed to Nanjing or that they represent Nanjing's

sole marketing efforts.

Additionally, Plaintiffs make the argument that they sell their products to manufacturers

that in turn use them to make their own products, which are then sold to end users. This argument

appears to be just that—an argument. Plaintiffs do not point to record evidence that supports their

contention. Indeed, the evidence they do cite could support a contrary finding, *i.e.*, that "one of the plaintiffs is the U.S. selling arm," which apparently markets to end users, just not as much as CYDSA does. *See* Pls.' Cmts.' 22 ("[Marketing] cost for [Plaintiff Uniphos] was slight and the operations minimal.").

Finally, Plaintiffs cannot seriously question the Department's finding that CYDSA's selling expenses are not clearly broken out in the company's financial statement, making it impossible to "know what portion of CYDSA's selling expenses can be attributed to marketing and branding." Remand Results at 20. Based on the foregoing, the court finds no error with respect to Commerce's finding that any claimed differences in Plaintiffs' and CYDSA's marketing and branding expenses did not distort surrogate financial ratios.

### B.      Claimed Differences in Levels of Integration

Plaintiffs argue that CYDSA's and Nanjing's "levels of integration are very different." Pls.' Cmts. 21. According to Plaintiffs, whereas CYDSA self-produces raw materials, Nanjing procures its raw materials from third-party suppliers. When examining the two companies' production experiences, including whether and to what extent they self-produce raw materials, Commerce stated:

> [W]e disagree that CYDSA is integrated to the point that its financial experience is so dissimilar from [Nanjing's] that it cannot be used for surrogate ratio valuation purposes. . . . CYDSA lists two operation segments, and the production of electricity (and steam) is not listed among them. The CYDSA financial statements do not quantify the amount of electricity the company produced; however, it cannot be that CYDSA produced all of the electricity it consumed, because it continues to build electricity-producing plants, nor is electricity listed as one of its operating segments. In addition, [Plaintiffs] impl[y] that CYDSA mines salt and is, therefore, vertically integrated; however, the CYDSA statements indicate that the salt produced is from evaporation, not mines. While we examine how similar a proposed surrogate producer's production experience is to the [nonmarket economy] producer's production experience, our analysis is not dependent upon matching the exact production experience of the respondents. The statute directs . . . that Commerce shall utilize prices in one or more market economy

> countries that are "a significant producer of comparable merchandise," which in
> this case is chemicals. It does not provide that significant producers engage in
> business of only comparable merchandise. That CYDSA also produces some
> electricity is irrelevant as to whether it is also a significant producer of comparable
> merchandise, *i.e.*, chemicals.

Remand Results at 18. Thus, the statute directs that the financials be from "a significant producer"

of merchandise that is comparable to that produced by Nanjing. That CYDSA is such a producer

of comparable merchandise is not in dispute. In its Remand Results, Commerce found that

although CYDSA self-produced some raw materials (including electricity), the record evidence

did not show that its production experience was so dissimilar from Nanjing's that using the

company's financial statement would lead to distorted ratios for overhead, selling, general, and

administrative expenses, and profit.

Plaintiffs contest the Department's integration finding, attempting to draw distinctions

between CYDSA's and Plaintiffs' production experiences:

> CYDSA withdraws from the ground some of its basic raw materials (salt brine) and
> produces other basic raw materials (electricity used as material). . . . In addition,
> CYDSA generates its own electricity and steam and uses a substantial quantity of
> each in the production process. . . . CYDSA is also integrated on the other side of
> the process, including direct interaction with the retail consumer in the marketplace
> including the promotion of brands at retail. . . . CYDSA is a huge company
> incorporating more than 20 subsidiaries located in 8 cities and serving customers
> in more than 20 countries with over 200 different products and numerous brand
> names. . . .
>
> In contrast, plaintiffs source[] [their] raw materials from other producers that have
> produced these raw materials. . . . Plaintiffs also do not generate [their] own
> electricity or steam, but rather purchase[] this material from independent
> suppliers. . . . Plaintiffs are also not integrated on the other side of the process, but
> rather sell[] [their] goods to other entities that use the materials [they] provide[] to
> manufacture other products and services sold to the ultimate end user. . . . [A]s the
> Department correctly notes, one of the plaintiffs is the U.S. selling arm,
> however . . . such cost for this affiliate was slight and the operations minimal.

Pls.' Cmts. 21-22 (internal citations omitted).

Plaintiffs' integration arguments are unpersuasive. When determining whether substantial

evidence supports Commerce's selection of surrogate data, "while a surrogate value must be as

representative of the situation in the [nonmarket economy] country as is feasible," the Department

"need not duplicate the exact production experience of [the respondent] at the expense of choosing

a surrogate value that most accurately represents the fair market value of [an input]." *Nation Ford*

*Chem. Co.*, 166 F.3d at 1377 (citation omitted). Here, while the companies' production experiences

may be different in terms of self-production of some raw materials (including electricity),

Commerce reasonably concluded that using CYDSA's financial statement would not distort

surrogate financial ratios. For example, there is no dispute that the record evidence does not

establish the amount of electricity CYDSA produced during the period of investigation. *See*

Remand Results at 18. And while, as Plaintiffs note, the company does get some salt brine from

wells, there is no way of telling how much. Indeed, as stated in CYDSA's financial statement,

"[t]he Company depends on its suppliers for the provi[sion] of raw materials. Gas and electricity

are raw materials used in the production of chlorine and caustic soda, as well as salt . . . ." *See*

CYDSA's Financial Statement. Thus, while CYDSA's manufacturing experience with respect to

electricity and salt brine may be different from Plaintiffs' experience, Plaintiffs have pointed to no

record evidence from which it can be determined if these differences distort CYDSA's financial

statement so as to make it unusable. *See Heze Huayi Chem. Co. v. United States*, No. 17-00032,

2018 WL 2328183, at *7 (CIT May 22, 2018) (quoting *Downhole Pipe & Equip., L.P. v. United*

*States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)) ("[T]he court may not 'reweigh the evidence or . . .

reconsider questions of fact anew.").

### III.    The Surrogate Value for Ocean Freight, as Revised in the Remand Results, Is Supported by Substantial Evidence

In the Final Determination, when making its dumping determination, Commerce compared the normal value of the subject chemicals to their U.S. price. When determining U.S. price, the Department made deductions for movement expenses, including ocean freight and brokerage and handling expenses.

For the ocean freight deduction, Commerce determined a surrogate value for ocean freight using four international shipping price quotes from the Descartes database. Two of the four quotes contained a list of fees associated with the shipment, which were included in the surrogate value:

> Suez Canal transit fee, Panama Canal transit fee, carrier security charge, high security seal charge, Gulf of Aden charge, equipment interchange receipt fee, OTHC – non-reefer, bunker charge, documentation fee, advance manifest security charge, [and] Customs importer security filing . . . .

Remand Results at 24. The other two quotes were less detailed, indicating only a "port surcharge fee." *See* Descartes Data.

For the brokerage and handling deduction, Commerce calculated a surrogate value using the World Bank's 2016 Doing Business Report for Mexico. *See* Letter from Levin Trade Law, P.C. to Penny Pritzker, Sec'y of Commerce (Aug. 18, 2016) Ex. 16, P.R. 146. Included in brokerage and handling were "border compliance" costs and "documentary compliance" costs. The report, however, did not identify, with specificity, the fees that might have been included in these costs.

On remand before the agency, Plaintiffs argued that some of the fees (*e.g.*, Suez Canal transit fee) should be excluded from the ocean freight calculation because they were already included in the surrogate value for brokerage and handling. In the Remand Results, Commerce

agreed that there was a possibility of double counting, but rather than exclude particular fees, the

Department excluded from its calculation the two price quotes that contained those fees:

> [Plaintiffs have] argued that certain . . . fees should be excluded from the [ocean
> freight] calculation, because they claim these [fees] are already included in the
> brokerage and handling surrogate value. We note that these fees are not defined on
> the record. In addition, whereas these fees are very specific, the *Doing Business*
> charges [*i.e.*, the brokerage and handling charges] are for general categories of fees.
> It is Commerce's practice to avoid double counting. As such, we have excluded
> two of the four international freight price quotes [*i.e.*, the Descartes quotes] from
> the calculation of the international freight [surrogate value] in order to avoid any
> possibility of double counting.

Remand Results at 24. In other words, because the fees listed in the two detailed quotes were not

defined in the record, the Department decided to use the two less-detailed quotes, *i.e.*, the quotes

that only listed a "port congestion surcharge," to calculate a surrogate value for ocean freight. That

is, the Department "use[d] the two price quotes that most unequivocally demonstrate[d] that no

double counting has occurred in an effort 'to avoid any possibility of double counting.'" Def.'s

Resp. 18. These revisions resulted in a change to the surrogate value for ocean freight from 0.1833

USD/kg to 0.1962 USD/kg, and, thus, an increase in the amount deducted from U.S. price (*i.e.*, a

lowering of U.S. price). Consequently, Nanjing's antidumping rate increased from 63.80 percent

to 67.66 percent. *See* Remand Analysis Mem. at 1.

   Here, Plaintiffs argue that the Department erred in its adjustment to the ocean freight value.

Rather than exclude the price quotes that expressly included the fees that may have overlapped

with brokerage and handling fees, Plaintiffs argue that Commerce should have excluded the two

less-detailed quotes and then adjusted the remaining quotes by deducting fees that were likely

included in brokerage and handling. *See* Pls.' Cmts. 4-5.

   In their brief before the court, however, Plaintiffs fail to cite any record evidence to support

their view that the two less-detailed quotes must have included fees that overlapped with the

brokerage and handling charges. Rather, they cite pages of their own case brief before the agency, which assert the same arguments, verbatim, that they make in their brief before the court. Neither the case brief nor Plaintiffs' brief before the court contains record citations to support their arguments.

As with their arguments questioning the use of CYDSA's statement to value financial ratios, Plaintiffs urge the court to find Commerce's ocean freight determination unsupported by the record, despite failing to point to record evidence that directly supports their position. On the contrary, after this case was commenced Commerce took seriously Plaintiffs' claim that there was a risk that it had double counted certain fees. *See* Def.'s Resp. 18 ("Although Commerce maintains that there is no record evidence of double counting, Commerce heeded [Plaintiffs'] arguments and determined to use the two price quotes that most unequivocally demonstrate that no double counting has occurred in an effort 'to avoid any possibility of double counting.'"). Thus, where the Department could identify those potentially double-counted fees, it excluded the quote. *See* Remand Analysis Mem. at 2 ("In accordance with the final remand, in order to avoid any possibility of double counting, we excluded certain [ocean] freight price quotes from the [ocean] freight surrogate value. The revised [ocean] freight surrogate value is 0.1962 USD/kg."). Where it could not, it continued to use the Descartes quotes (the only surrogate information on the record for ocean freight). *See* Remand Results at 10 (noting that a "port congestion surcharge is not listed as one of the expenses included in [brokerage and handling]."). Plaintiffs have the burden of placing on the record the evidence to define the fees that they believe were double counted. *See* 19 C.F.R. § 351.301(a) ("The Department obtains most of its factual information in antidumping . . . proceedings from submissions made by interested parties during the course of the proceeding."); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)

(citations omitted) ("Although Commerce has authority to place documents in the administrative record that it deems relevant, the burden of creating an adequate record lies with interested parties and not with Commerce."). In the absence of record information that shows the fees were, in fact, double counted, Commerce's exclusion of the two quotes that expressly identified the fees included in the ocean freight rate was reasonable.


## CONCLUSION

Because Commerce's determination that CYDSA's financial statement was the best available information to calculate surrogate financial ratios and its determination of a surrogate value for ocean freight are supported by substantial evidence and otherwise in accordance with law, the court sustains the Remand Results. Judgment shall be entered accordingly.


                                                         /s/ Richard K. Eaton
                                                       Richard K. Eaton, Judge


Dated:          December 10, 2019
                New York, New York